IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



**LORILLARD TOBACCO COMPANY,**
**and**
**LORILLARD LICENSING COMPANY, L.L.C.,**
                    Plaintiffs,

v.                                                      Civil Action No. 3:10cv817-JAG

**CALIFORNIA IMPORTS, LLC, *et al.*,**
                    Defendants.

## MEMORANDUM OPINION

In this case, the plaintiffs contend their famous cigarette brand NEWPORT and its related trademarks have been violated intentionally by the defendants' NEWPROT "potpourri" smoking product. The Court held a bench trial, and as requested, the parties then submitted briefs detailing their proposed findings of fact and conclusions of law. For the reasons stated herein, the Court will rule in the plaintiffs' favor on all counts. Additionally, the Court finds that this is an exceptional case under 15 U.S.C. § 1117(a) such that an award of attorneys' fees is warranted.

## I. Parties[1]

Lorillard Tobacco Company and Lorillard Licensing Company, L.L.C. (collectively, "Lorillard") are the plaintiffs in this action. Lorillard Tobacco Company is a Delaware corporation with its headquarters in Greensboro, North Carolina. Its subsidiary, Lorillard Licensing Company, L.L.C., is a North Carolina limited liability company with its headquarters

---

[1] Several parties are no longer part of the case. M.M.H.A. Corporation and John Does 1-10 were dismissed without prejudice before trial, and a consent judgment was entered as to Sunrise Wholesale LLC and as to California Imports, LLC. (*See* Order (Dk. No. 46); Consent Judgment (Dk. No. 65); Consent Judgment (Dk. No. 66).)

also in Greensboro, North Carolina.  NEWPORT is Lorillard's leading cigarette brand, the top menthol cigarette sold in the United States, and the nation's second leading brand overall, with 12% of the market.  (Supp. Written Stipulations of Undisputed Fact ("Supp. Stip.") ¶ 43 (Dk. No. 79).)  Sales of NEWPORT brand cigarettes accounted for approximately 90% of Lorillard's revenue in 2010.  (*Id.* at ¶ 44.)  Lorillard Licensing Company, L.L.C. owns all relevant trademark rights associated with NEWPORT cigarettes and licenses them to Lorillard Tobacco Company.  (*Id.* at ¶ 42.)  Key Lorillard trademarks include the word mark NEWPORT, the NEWPORT & Design mark (which combines the word mark "NEWPORT" with the box's design), and various elements of NEWPORT functional trade dress, such as a stylized "Newport" and a black and white spinnaker.[2]  (*Id.* at ¶ 46-48.)

The relevant defendants in this action are Global Market Direct, Ltd. ("Global"), an unincorporated business[3]; Majdi Abujamous, a.k.a. Mike James ("Majdi Abujamous" or "Majdi"); and Mohommad Abujamous, a.k.a. Mohd Abujamous, a.k.a. Moe Abujamous ("Moe Abujamous" or "Moe").  Global's business was advertising, distributing, and selling "spice" products.[4]  Majdi Abujamous and Moe Abujamous are brothers.  (*See* Trial Tr. 79:4-7 (Dk. No.

---

[2] Lorillard has obtained several registrations from the United States Patent and Trademark Office for these and other relevant marks, e.g., the word mark NEWPORT (Reg. No. 1,108,876), the NEWPORT & Design mark (Reg. No. 1,191,816), the stylized word "Newport" (Reg. No. 2,600,870), and the black and white spinnaker (Reg. No. 1,178,413).  (Supp. Stip. at ¶¶ 46-48; Plaintiffs' Written Stipulation of Uncontroverted Facts ("Stip.") ¶¶ 6-7 (Dk. No. 71).)

[3] The defendants contend that Global was incorporated in the Dominican Republic, but there is no registration supporting that.  (*See* Pls.' Ex. 59 (Certificate from the Nat'l Office of Indus. Prop. of the Dom. Rep.).)  At trial, counsel for the defendants admitted they possessed no evidence of Global's registration with any state or country.  On April 17, 2012, the defendants submitted a Supplemental Exhibit List with incorporation documents in the Commonwealth of Dominica.  (Dk. No. 85.)  The Court struck this submission with its order of May 7, 2012 (Dk. No. 88), and it will not be considered in rendering judgment.

[4] "Spice" is usually a mix of dried herbs, flowers, tobacco leaves, and other substances, all of which are sprayed with a synthetic chemical similar to THC, the active ingredient in marijuana. (*See* Pls.' Exs. 55-58; Stip. at ¶ 13.)  Users smoke "spice" products to replicate the effects of

81).) Their family operates a trio of "Tobacco Zone" stores in the Richmond, Virginia area, and in the past, the two brothers worked in those stores. (Trial Tr. 78:8-24; Dep. of Majdi Abujamous, Aug. 22, 2011 ("Ma. Abujamous Dep. I"), at 11:23-12:3.)

Beginning in 2009 and continuing into 2011, Majdi Abujamous advertised, distributed in commerce, and sold a variety of "spice" products, which he referred to as "herbal incense," under the name Spice99. (Stip. at ¶ 9; Trial Tr. 79:19-22.) In late 2009, Moe Abujamous joined those efforts and was actively involved in the business through January 2011. (Trial Tr. 82:19-21.) While Moe Abujamous currently resides in Midlothian, Virginia, the present whereabouts of Majdi Abujamous are unknown. (Trial Tr. 77:6-7; 72:15-18.) Only Moe testified at trial.

## II. Background

In the fall of 2010, the defendants began advertising, distributing, and selling a particular variety of spice named NEWPROT. Beyond the seemingly familiar name, the NEWPROT product also appeared in pouches (0.5 gram, 1.0 gram, or 3.0 grams) that mirrored the distinctive elements of Lorillard's NEWPORT trade dress. (*See* Trial Tr. 130:14-16; Pls.' Exs. 1-5, 9.) To advertise the NEWPROT potpourri, the defendants delivered approximately 1,250 point-of-sale posters to retailers and wholesalers. (*See* Stip. ¶¶ 22, 23; Ma. Abujamous Dep. I at 101:7-9; 103:14-14-104:2.) The defendants used their website, www.spice99wholesale.com, to advertise the new product. (Pls.' Ex. 34 (Spice99wholesale.com Screenshoots).) Additionally, retail tobacco shops, convenience stores, and wholesalers received samples of the NEWPROT product from the defendants. (Stip. at ¶¶ 18-21; Trial Tr. 87:13-19; 89:9-20; 93:14-94:14; Pls.' Ex. 9.)

---

marijuana. While NEWPROT may or may not have contained tobacco and was labeled as "not for human consumption," marketing their products under the trade name "Spice99" associated their merchandise with the "spice" products.

3

In total, the defendants sold or distributed at least 2,000 pouches of the NEWPROT product, including to at least one wholesaler in North Carolina. (Trial Tr. 57:17-58:2.)

After discovering the defendants' product, Lorillard filed its complaint (the "Complaint") on November 5, 2010.  Lorillard brought four counts under the Lanham Act, 15 U.S.C. § 1051, *et seq.*: (I) infringement and counterfeiting of registered marks (§ 1114), (II) trade dress infringement (§ 1125), (III) unfair competition (§ 1125), and (IV) trademark dilution (§ 1125(c)). Lorillard also brought one count, Count V, for trademark infringement under Virginia common law.

### III. Discussion

### A. Infringement

#### 1. *Counts I, II, III, and V - Trademark Infringement/Unfair Competition*

To prevail on its causes of action for trademark infringement and unfair competition, Lorillard must show: (1) that it possesses a valid trademark or trademarks; (2) that the defendants used the mark or marks (or a colorable imitation); (3) in commerce; (4) that the use of the mark was in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the defendants' use was likely to confuse consumers.  *See* 15 U.S.C. §§ 1114, 1125(a); *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005); *People for the Ethical Treatment of Animals v. Doughier*, 263 F.3d 359, 364 (4th Cir. 2001); *Lone Star Steakhouse & Salon v. Alpha of Virginia Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).  Importantly, the same analysis applies to both trademarks and trade dress such that "the two issues rise or fall together." *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 269 (4th Cir. 2007). Furthermore, Virginia's common law standards for trademark infringement and unfair competition mirror the Lanham Act test "because both address the likelihood of confusion as to

4

the source of the goods or services involved." *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 930 n.10 (citations omitted).  As such, the Court will address Counts I, II, III, and V together.

In short, Lorillard has met its burden on all of these counts.  As to the first element, the parties have stipulated to Lorillard's ownership of the NEWPORT trademarks, to the validity, distinctiveness, and fame of those marks, and to the validity of the ten United States Trademark Registrations covering Lorillard's marks.  (Stip. ¶¶ 6-8.)  Lorillard, thus, satisfies the test's possession prong.  With respect to the second element, 15 U.S.C. § 1127 defines "colorable imitation" as a mark "which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive."  This definition fits squarely within the analysis of the fifth element discussed *supra*, in which the Court finds that the mark used by defendants was likely to confuse consumers.  As such, the defendants' use of the "colorable imitation" satisfies the second element.

Third, the Court finds that the defendants used the marks in commerce by advertising the NEWPROT product on the Internet, distributing samples of the product, and then selling the merchandise.  Furthermore, this use was "in connection with the sale, offering for sale, distribution, or advertising of goods" because the defendants used Lorillard's marks to advertise, offer, distribute, and sell their "spice" products both on and offline.  *See* 15 U.S.C. § 1114(a).

Lastly, the defendants' use of the distinctive marks satisfies the fifth element because it was likely to cause confusion among consumers.  The Fourth Circuit has identified seven factors to aid courts when determining whether consumer confusion is likely, but cautioned that "not all these factors are always relevant or equally emphasized in each case." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).  The seven factors are: "(a) the strength or distinctiveness of the mark; (b) the similarity of the two marks; (c) the similarity of the

goods/services the marks identify; (d) the similarity of the facilities the two parties use in their businesses; (e) the similarity of the advertising used by the two parties; (f) the defendant's intent; and (g) actual confusion." *Id.* (citation omitted); *see also Louis Vuitton*, 507 F.3d at 259. While no evidence of actual confusion exists, the remaining factors favor the plaintiffs.

The marks associated with NEWPORT are strong and distinct; they are unique, well-known, and widely recognized as signifying Lorillard's brand of cigarettes. Moreover, the marks associated with NEWPORT are "famous" as defined by 15 U.S.C. § 1125. This first factor, therefore, favors Lorillard. Here, the marks at issue are extremely similar. The only difference between the defendants' NEWPROT and Lorillard's NEWPORT is the transposition of the "O" and "R." The label of NEWPROT also mimics each and every element of the NEWPORT trade dress, copying Lorillard's registered marks. Only minor, trivial differences exist between the instant marks such that they are virtually indistinguishable.

Both the parties' marks are also used in connection with smoking products and sold in similar channels of commerce. While NEWPROT is not a cigarette (and may or may not qualify as synthetic marijuana), it is a smoking product. The advertising and distribution of NEWPROT to retailers and wholesalers of tobacco products underscore its character as a smoking product. Additionally, the parties both sought out and utilized tobacco shops, convenience stores, and wholesalers as part of their businesses. Finally, Lorillard and the defendants also used point-of-sale advertising posters at these retail and convenience stores to attract prospective customers.

The sixth and last factor weighs the defendants' intent. Through their family business, Majdi and Moe Abujamous have been involved in retail tobacco sales for over a decade. Both were familiar with the NEWPORT brand and its reputation when they began distributing their spice. While the defendants did not create the NEWPROT packaging—they relied on an

6

international third-party—the two still chose to trade upon the goodwill and prestige Lorillard had established in NEWPORT by advertising, distributing, and selling their product under a virtually identical guise.

Although no evidence of actual confusion exists in this case, not every single factor is always relevant in each analysis. *Pizzeria Uno*, 747 F.2d at 1527. Notably, the remaining factors weigh heavily in the plaintiffs' favor. Lorillard has, therefore, satisfied all of the elements of its trademark infringement and unfair competition claims against the defendants. Judgment in the plaintiffs' favor on Counts I, II, III, and V shall be entered.

### 2. *Count IV - Dilution*

To prevail on its dilution claim in Count IV of the Complaint, Lorillard must demonstrate: (1) that it owns a famous mark that is distinctive; (2) that the similarity between Lorillard's mark and the defendants' mark gives rise to an association between the two; and (3) that the association is likely to impair the distinctiveness of the famous mark or likely harm the reputation of the famous mark. *See Louis Vuitton*, 507 F.3d at 259.

A mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *See* 15 U.S.C § 1125. As the leading menthol cigarette brand in the United States, and the country's second leading brand overall, NEWPORT satisfies this definition. Consumers can easily recognize the marks associated with NEWPORT. As discussed, the defendants sold NEWPROT in commerce as a smoking-type product, creating an association between the two marks.

The final element asks whether there is dilution by blurring or tarnishment. In its analysis, the Court must first turn to the six factors enumerated in 15 U.S.C § 1125(c)(2)(B):

    (i)     The degree of similarity between the mark or trade name and the famous mark.

     (ii)     The degree of inherent or acquired distinctiveness of the famous mark.
     (iii)    The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
     (iv)    The degree of recognition of the famous mark.
     (v)     Whether the user of the mark or trade name intended to create an association with the famous mark.
     (vi)    Any actual association between the mark or trade name and the famous mark.

15 U.S.C § 1125(c)(2)(B).  These factors overlap with much of the infringement discussion above and similarly favor Lorillard.  Here, the defendants' mark is not only similar, but nearly identical to Lorillard's famous mark.  The defendants themselves agree that most people are familiar with NEWPORT.  ("Ma. Abujamous Dep. II" at 115:8-21; Trial Tr. 78:22-79:3.)  Based on the similarity of the products, it is clear that the defendants intended to trade on the goodwill and popularity of the defendants' mark.  Furthermore, although there is no proof of actual confusion between the two products, there is evidence of actual association.  In his deposition, Fazal Mitha testified that he asked Majdi Abujamous about NEWPROT because he was worried about the legality of the product based on its similarity to the trade dress for Lorillard's cigarette. (Dep. of Fazal Mitha, July 22, 2011, ("Mitha Dep.") at 31:5-32:7.)  Mitha also stated that his customers were similarly worried and a few chose not to purchase NEWPROT due to this similarity. (*Id.* at 32:8-20.) Weighed together, the Court finds that the six factors collectively show a likelihood of dilution by blurring.

     Dilution by tarnishment exists where there is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous." 15 U.S.C § 1125(c)(2)(C).  Defendants advertised, distributed, and sold NEWPROT as "spice," and advertised Spice99 to customers interested in "legal highs." (Pl.'s Ex. 28.)  At the same time, similar products were sparking controversy: media reports documented injuries and illnesses caused by synthetic marijuana, and lawmakers moved to ban the products.  While the actual

contents of NEWPROT may not be clear, its marketing as "spice" created a likely association among NEWPROT, NEWPORT, and controversial synthetic marijuana. The Court concludes that this association would harm Lorillard and its trademarks.

Accordingly, the Court will grant judgment in the plaintiffs' favor on the dilution claim in Count IV.

## B. The Defendants' Liability

### 1. Global

In short, Global is a fictitious entity. There is no evidence of incorporation or registration, and it has no identity separate from its owners.[5]   As such, it is not capable of shielding Majdi Abujamous or Moe Abujamous from individual liability. Each played a role in the NEWPROT scheme, and those actions form the basis of their individual liability.

### 2. Majdi Abujamous

Majdi Abujamous described his role in the "spice" business as "basically the manager, the CEO, everything." (Ma. Abujamous Dep. I at 10:15-16.) His role was equally large when the NEWPROT product began distribution: "I was the boss. I am the owner of the business or the manager of the business, and I take full responsibility for [the sale of NEWPROT]." (Dep. of Majdi Abujamous, Aug. 23, 2011, at 141:11-13 ("Ma. Abujamous Dep. II"). From the beginning, he was an active participant in the advertising, distribution, and sale of the NEWPROT product. Thus, he is individually liable for the counts detailed herein.

### 3. Moe Abujamous

Finally, Moe Abujamous was an active participant in and contributor to Global's "spice" business, specifically with respect to NEWPROT. He joined his brother's operation in

---

[5] *See infra* note 3.

November 2009 and continued working with Majdi Abujamous for about a year. (Trial Tr. 79:19-22.) According to the business cards he distributed, Moe was the "Field Manager." (*Id.* at 143:18-23.) In that role, he directed the marketing of Spice99 products and worked to find new clients for these products. (*Id.* at 83:2-5.) Moe visited tobacco shops, gas stations, convenience stores, barber shops, and tattoo parlors to distribute samples of Spice99 products, including NEWPROT, for about ten to fifteen hours per week. (*Id.* at 83:14-84:11; 85:15-18; 92:11-15.) Personally, Moe Abujamous distributed at least 300 packets of NEWPROT product. (*Id.* at 93:14-94:3.) He made decisions concerning when, where, and how to market NEWPROT and other Spice99 products. (Trial Tr. at 87:3-11.) For example, he created and carried out a plan to exhibit Spice99 products at trade shows, including one in New York in September 2010.[6] (Ma. Abujamous Dep. II at 160:1-16, 162:8-163; Trial Tr. 97:22-98:8.) He was also the registrant of the domain <spice99wholesale.com>. (Defs.' Answer, Affirmative Defense and Jury Demand ¶ 8 (Dk. No. 20).) Moe was also the first contact for anyone seeking employment with the "spice" business. Advertisements for jobs with Spice99 listed his email address and company phone number, with direct extension, as the contact information for applicants. (*See* Pls.' Ex. 42, Trial Tr. 96:11-97:1; 146:21-147:8.) Finally, Moe Abujamous authorized a refund for Fazal Mitha, the manager of California Imports, L.L.C., after NEWPROT products had been seized. (Trial Tr. 66:12-16.) Based on these dealings, Mitha believed Moe Abujamous was "in charge" of Spice99. (Trial Tr. 66:12-16.)

Moe Abujamous also had another website, briefly, for his own company, A.J. Group, Inc. (Trial Tr. 133:15-21.) The opening page of that site mirrored the Spice99 site exactly, and the

---

[6] At trial, Moe denied the fact that attending the trade show was his idea, in conflict with Majdi's deposition testimony to the contrary. (Trial Tr. 101:18-102:5.) Regardless, Moe played a substantial role in Global's operations.

website referred to this new company as "Spice Limited," one of the aliases of Global. (Trial Tr. 134:1-135:24.) This new A.J. Group site also listed the same contact information and phone number used for people inquiring about Spice99 or about positions with that business. (*Id.*) A link allowed users to "like" the A.J. Group on Facebook; this link sent users to the Spice99 Facebook page. (Trial Tr. 136:17-24.)

Ultimately, Moe had an active and key role within this "spice" operation. He made major marketing decisions, had the ability to screen job applicants, and authorized refunds. To at least one customer, he appeared to be "in charge" of Global. Later, he even resurrected its website and continued Global's business under a new name. He personally distributed the NEWPROT product and sent advertisements with its image to local businesses. Accordingly, the Court finds that Moe is individually liable for the infringement and dilution of Lorillard's trademarks and trade dress.

## C. Attorneys' Fees and Costs

The attorneys' fees amendment to the Lanham Act is designed to give judges discretion to equitably shift the burden of litigation costs in exceptional cases. *Flexible Bens. Council v. Feltman*, No. 1:08cv371, 2009 WL 1351653, at *4 (E.D. Va. May 14, 2009) (stating that the judge should consider "factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser" when determining whether to award attorneys' fees) (citing *Spiroflow Sys., Inc. v. Flexicon Corp.*, No. 3:02cv70, WL 4371383, at *2 (W.D.N.C. Sept. 18, 2008)); *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 31-32 (1st Cir. 2002) ("[T]he purpose of the attorneys' fees amendment to the Lanham Act was to provide for an award in exceptional cases in which equity called for an award in the sound discretion of the district judge."). Under the Lanham Act, a "court in exceptional cases may award reasonable

attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Lanham Act does not define "exceptional cases," but the Fourth Circuit has interpreted the Act's legislative history to read "exceptional cases" as those involving "[d]eliberate and flagrant infringement." *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 599 (4th Cir. 1992). Further, a prevailing plaintiff must show that the defendant acted "in bad faith."[7] *Toolchex, Inc. v. Trainor*, No. 3:08-CV-236, 2009 U.S. Dist. LEXIS 64186, at *9 (E.D. Va. July 24, 2009). Finally, conduct supporting a finding of an "exceptional case" can occur during the infringement or during litigation and must be demonstrated by clear and convincing evidence. *Outsidewall Tire Litig.*, 748 F. Supp. 2d 557, 562 (E.D. Va. 2010); *Brooks Furniture Mfg., v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005). As explained below, the defendants in this case acted willfully and in bad faith. The Court will award costs and attorneys' fees to the plaintiffs.

*1. Deliberate/Willful*

---

[7] Some courts of appeal, including the 4th Circuit, have established bad faith as a requirement for an award of attorneys' fees under the Lanham Act. *See Scotch Whisky Ass'n*, 958 F.2d at 599 ("It is clear . . . that for a prevailing plaintiff to succeed in a request for attorney fees, she must show that the defendant acted in bad faith."); *Tamko Roofing Prods., Inc.*, 282 F.3d at 31-32 (providing the following: "*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 194 (2d Cir. 1996) (reciting Second Circuit rule requiring a showing of fraud or bad faith on the part of the infringer); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir. 1992) ("requiring a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud") . . . . Other circuits [have held] that willfulness alone is an adequate basis for the award of attorneys' fees. *Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998) ("deliberate or willful" conduct on part of defendant in "failing to cease and desist from use of [the trademark] despite its written commitment to do so" was enough to warrant award of attorneys' fees); *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 123 (8th Cir. 1987) ("Bad faith is not a prerequisite to a Lanham Act fee award.")."). A bad faith requirement constitutes a more stringent restriction on when courts should award attorneys' fees, and even under this stricter standard, the plaintiffs in this case prevail. Even if this court were to follow those Circuits in which bad faith is not a requirement, the actions by the defendants in this case satisfy the "exceptional case" standard for deliberate and willful infringement.

An exceptional case exists where a defendant's conduct was "malicious, fraudulent, willful or deliberate in nature." *Retail Servs. v. Freebies Publ'g,* 364 F.3d 535, 550 (4th Cir. 2004) (citing *Doughney,* 263 F.3d at 370). "To constitute willfulness, the actions must have been 'voluntary and intentional, but not necessarily malicious.'" *Trainor,* No. 3:08-CV-236, 2009 U.S. Dist. LEXIS 64186, at *9 (citing *Flexible Benefits Council,* 2009 WL 1351653, at *4 n.1). Further, more than negligence is required to justify an award of attorneys' fees. *Chanel, Inc. v. Banks,* No. WDQ-09-843, 2010 U.S. Dist. LEXIS 135374, at *40-41 (D. Md. Dec. 22, 2010) ("More than mere negligence is required for an award of attorney attorney's fees, but where, as here, 'there is proof of intentional infringement . . . it [would be] an abuse of discretion not to award attorney's fees.") (alterations in original) (as amended Jan. 13, 2011) (amended report and recommendation) (quoting J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 30:100).

The defendants acted willfully and deliberately in carrying out their infringement of Lorillard's marks. Majdi Abujamous testified that he was familiar with NEWPORT cigarettes and that "[t]he majority of people probably know Newport." ("Ma. Abujamous Dep. II" at 115:8-21.) When asked in his deposition whether the NEWPROT label looks "like the front of the Newport package," Majdi responded "Look like it?  Very familiar.  Very similar to it." ("Ma. Abujamous Dep. II" at 148-49.)  Majdi describes the NEWPROT label as "familiar," which demonstrates the clear tie between the defendants' product and the famous NEWPORT design. Furthermore, Moe Abujamous testified at trial that he knew what the NEWPORT logo and packaging looked like and that a majority of people in the United States probably knew about the NEWPORT brand. (Trial Tr. 78:22-79:3.)  When asked in his deposition if the labels

13

on each product looked alike, Moe testified, "I mean, they look similar." (Dep. of Moe Abujamous, Aug. 10, 2011 ("Moe. Abujamous Dep.") at 115:24-116:6.)

In sum, the defendants were aware of Lorillard's NEWPORT label and the nationwide popularity of the product. They also admit to the similarity between the NEWPORT and NEWPROT marks. As such, their decision to advertise, distribute, and sell their NEWPROT smoking product amounts to "deliberate and flagrant infringement." *See Virtual City Vision, Inc. v. Tran*, 650 F.3d 423, 441 (4th Cir. 2011) (explaining that the use of a domain name similar to a popular woman's apparel company (about which the defendant had knowledge) for women's apparel advertisements constituted deliberate infringement). Although the defendants' actions did not constitute a malicious attempt to harm the plaintiffs, the defendants actions were willful and deliberate because of their awareness of the famous cigarette brand and their decision to market the NEWPROT smoking product to merchants selling NEWPORT. *See Trainor*, 2009 U.S. Dist. LEXIS 64186, *9-10. These were not acts of negligence, but rather deliberate decisions to trade on the popularity and widespread recognition of Lorillard's established brand. The evidence in this case is clear and convincing that the defendants deliberately used the NEWPROT mark to infringe the plaintiffs' mark.

### 2. Bad faith

The defendants' conduct both during discovery and at trial constituted bad faith and, as a result, warrants a grant of attorneys' fees. "[F]or a prevailing plaintiff to succeed in a request for attorney fees, she must show that the defendant acted in bad faith." *Scotch Whisky Ass'n*, 958 F.2d at 599. To prove bad faith, "a showing of malicious conduct or knowledge of violation must be made." *Toolchex, Inc.*, 2009 U.S. Dist. LEXIS 64186, at *10. Further, litigation misconduct alone, including the conduct of the parties, can establish bad faith. *See id; Patsy's*

14

*Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 222 (2d. Cir. 2003) (affirming award and also noting that the combination willful infringement plus litigation misconduct supports attorney fees awards); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1482 (Fed.Cir.1998) ("Findings of exceptional cases have been based on a variety of factors, for example, . . . vexatious or unjustified litigation, or other misfeasant behavior.").

Here, the defendants' conduct amounted to "misfeasant behavior." *See id*. To begin, the defendants did not initially cooperate with discovery. The Court ordered expedited discovery of the case on November 9, 2010, which required interrogatory responses by the defendants within five days of service and depositions of the defendants within six days of the order. (Order Regarding Expedited Discovery (Dk. No. 9).) Despite the court order, the defendants failed to appear for their noticed depositions (Dk. Nos. 31.2, 31.3) and they did not respond to the plaintiffs' first set of interrogatories for over two months. Further, the Defendants' Responses to Requests for Production of Documents and Interrogatories dated January 21, 2011, contained factual inaccuracies. First, the response stated that NEWPROT had only been distributed as a free sample and that none had been sold, even though the defendants had actually sold the product to a wholesaler. (Pl.'s Ex. 12; Pl.'s Ex. 9 (invoice sent to CA Imports delineating 300 packages of NEWPROT for a price of $875).) Moe Abujamous should have been aware of this sale given that he had authorized its refund to CA Imports. (Trial Tr. 64:25-66:9.) Second, the responses stated that no advertising or publication for NEWPROT had been created, but in actuality, the defendants had created posters and a website which advertised and solicited NEWPROT sales. (Trial Tr. 119:24-122:17.) Despite any well-meaning intentions, the defendants also destroyed the remaining packages of NEWPROT contrary to a restraining order. (Trial Tr. 127:21-129:21; Pls.' Ex. 16, ¶ 1; Pls.' Ex. 17, ¶ 1; Pls.' Ex. 18, ¶ 1.)

15

Furthermore, the discovery responses the defendants eventually submitted were not models of candor.  Moe Abujamous's deposition testimony, which he clarified at trial as a misunderstanding, reflected that he had received his samples of NEWPROT from a person named Sam, but such a person does not exist.  Majdi Abudamous also stated in his deposition that he had never discussed the NEWPROT product with any customers, but Fazal Mitha's testimony at trial indicated that Majdi discussed how the "®" symbol on the packaging meant that it was a registered trademark and not illegal (despite not being trademarked).  (Ma. Abujamous Dep. II at 148-49; 142:13-143:20; Trial Tr. at 42:18-21.)

At trial, the defendants' continued to act in bad faith.  Generally, Moe Abujamous' testimony lacked clarity and transparency, and Majdi Abujamous' unexplained absence from the proceedings, despite his stipulated role as the company's leader, made discrepancies between the defendants' deposition testimony and Moe's trial testimony impossible to reconcile.  Although the defendants attempted to minimize Moe Abujamous' role in the Spice business, such attempts led to testimony that is clearly at odds with the facts of the case.  Moe Abujamous testified that his A.J. Group website did not sell any of the same types of products as Global.  (Trial Tr. 171:7-11.)  Moe also stated that the site "sold wholesale male enhancements and energy shots, and tobacco pipes and hookahs, you know, accessories.  Bracelets.  All kind of things." (Trial Tr. 138:9-22.)  These two statements are at clear odds with the screenshot of Spice99's website listing "tobacco pipes," and "sexual enhancement," under its "New Products." (Pl.'s Ex. 27.) Moe's testimony distorts the true operation of the new A.J. Group website, and the fact that the site used the same format, phone number, Facebook page, and products suggests that Moe carried on the Spice99 site's operations under a different name.  (Trial Tr. 134:2-136:20.)  These actions demonstrate a lack of candor in the defendants' testimony.

16

Moreover, the defendants claimed to be a corporation in the Dominican Republic (Ma. Abujamous Dep. I at 97:2-8.), but months after trial, they filed documents purportedly establishing incorporation in the Commonwealth of Dominica. (Dk. No. 85.1.) This delayed production resulted in unnecessary costs to the plaintiffs and further highlighted the defendants' lack of integrity. The defendants' conduct at trial combined with their actions during discovery establishes their bad faith at all phases of litigation.

In response, the defendants argue that attorneys' fees are not warranted as the plaintiffs have suffered no actual damages from NEWPROT's advertisement and sale. Actual damages are one of the many factors taken into account when determining attorneys' fees, however, and the actions of the defendants, when taken in their entirety, still allow for a grant of fees despite actual damages. *Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1224 (10th Cir. 1998) ("Although an absence of actual damages is a factor in determining whether a case is exceptional, such absence does not preclude a fee award.") (citing *Post Office v. Portec, Inc.*, 913 F.2d 802, 812 (10th Cir. 1990) (vacated on other grounds)).

## IV. Conclusion

Ultimately, the defendants in this case engaged in trademark infringement and dilution through the advertisement and distribution of NEWPROT as part of Global's business from 2009 to 2011. Further, the extraordinary circumstances of this case warrant an award of attorneys' fees and costs to the plaintiffs under 15 U.S.C. § 1117(a). Accordingly, the Court will grant the plaintiffs' request for attorneys' fees and costs in an amount to be determined.

For the reasons stated herein, the Court shall enter judgment in the plaintiffs' favor on all counts.

An appropriate order shall issue.

Date: <u>August 7, 2012</u>
Richmond, VA

/s/

John A. Gibney, Jr.
United States District Judge